## Frederick's Application

*George E. Wolfe*, for appellants.

REED, P. J., August 14, 1933.—William C. Frederick and Carrie Elizabeth Brown, having entered into a marriage contract, made application for a marriage license to the Clerk of the Orphans' Court of Cambria County, on March 27, 1933. It appears on the face of the application that William C. Frederick is of the white race, or that his color is white, and that Carrie Elizabeth Brown is a mulatto; and it further appears that the father of Carrie Elizabeth Brown was colored and her mother was white. The Clerk of the Court, Charles A. MacIntyre, Esq., refused the license on the ground that "the amalgamation of the races is not only unnatural but is always productive of deplorable results", and the application was certified to the orphans' court, as follows: "Now, June 24, 1933, the within license refused and I do hereby certify the same to the orphans' court for determination. Chas. A. MacIntyre, Clerk of Orphans' Court."

It is now settled beyond question in the State of Pennsylvania that marriage is a civil contract and, in fact, it has been so determined in the majority of the States; and, at common law, marriage is considered in no other light than a civil contract, and it requires no particular form of solemnization by church or state officials to make it valid: Stevenson's Estate, 272 Pa. 291; Craig's Estate, 273 Pa. 530. And furthermore, common-law marriages have from time to time been recognized by the courts of this State, regardless of race or color. Also, the contract to marry entered into between William C. Frederick and Carrie Elizabeth Brown is legal and binding upon the parties; a breach on the part of one would entitle the other to recover damages.

At the outset we will say that, if we were to decide this case in what we believe to be the best interest of civilized society, this license would be refused; however, the sixth article of the Constitution of the United States declares: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the

Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Therefore, until an act of assembly is passed in this State prohibiting intermarriage of races, regardless of a judge's personal opinion, it is the duty to grant licenses to applicants even though they are of different races. In 18 R. C. L. 409, sec. 31, under "Intermarriage of Races," it is said:

"Civilized society has the power of self-preservation, and marriage being the foundation of such society, most of the states in which the negro forms an element of any note have enacted laws inhibiting intermarriage between the white and black races; and the courts, as a general rule, have sustained the constitutionality of such statutes. Where such prohibition is contained in a state constitution it is self acting in the absence of any other provision in the same instrument limiting its operation. Statutes forbidding intermarriage of the white and black races were without doubt dictated by wise statesmanship, and have a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is always productive of deplorable results. The purity of the public morals, the moral and physical development of both races, and the highest advancement of civilization, under which the two races must work out and accomplish their destiny, all require that they should be kept distinctly separate, and that connections and alliances so unnatural should be prohibited by positive law and subject to no evasion."

The writer of this opinion heartily agrees with the above sentiments and believes that intermarriage between the races should be discouraged as far as possible, believing that it is just as inadvisable for the colored race to mix in marriage with the white race as it is for the white race to intermarry with them. We believe that the Power who created human beings never intended that there should be intermarriage between the races; apparently there was general segregation of the races by the laws of nature, or otherwise, and we can't conceive of any good results coming from the intermarriage of the races; on the other hand, such marriages may result in deplorable social conditions.

In 38 C. J. 1290, sec. 28, "Race or Color—(1) In General," we find: "At common law persons are not incapacitated to intermarry by reason of a disparity in race or color. Hence, in the absence of statutory prohibition, a white person and a negro may contract a valid marriage, as may a white and an Indian. In many states, however, by statute, marriage between white persons and negroes, or between white persons and mulattoes, or between white persons and Indians, is prohibited, and in a number of jurisdictions is made punishable criminally." But, as before indicated, we have no statute in Pennsylvania prohibiting intermarriage of the races; neither have we been able to find any cases either in the lower or appellate courts of this State to guide us in coming to a conclusion in this matter. We do, however, find the question squarely ruled in the case of Hart, Tutvix v. Hoss & Elder, reported in 26 La. Ann. 90, where Hart, a white man, married a colored woman, and the appellate court held that the marriage, having taken place prior to the code prohibiting intermarriage of the races, was legal, and that the children, all born to the couple before the marriage, were legitimate. While two of the judges dissented, yet, in the dissenting opinion, Judge Morgan stated (p. 101).

"Marriage is, with us, a civil contract, inheritance is regulated by law. White persons and persons of color may by this act contract marriage; colored children may inherit. This proposition I do not dispute. But I deny that the act in question professes to regulate the legitimation of children, or that it provides

how the fact of legitimation shall be established, or what acts constitute legitimation".

Therefore, after fully considering this application, we conclude that under the laws of this State the applicants are entitled to a license, regardless of the fact that one is a white person and the other a mulatto; and that the clerk should issue the license in the usual form.

### Decree

And now, August 14, 1933, after due consideration of the application and the facts set forth therein, the clerk is hereby ordered and directed to issue the marriage license applied for by William C. Frederick and Carrie Elizabeth Brown.

From Henry W. Storey, Jr., Johnstown, Pa.